UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

FRANKLIN L. SHIELDS,           )
                               )
          Plaintiff,           )
                               )        No. 1:06-CV-185
v.                             )
                               )        Magistrate Judge Susan K. Lee
COMMISSIONER OF SOCIAL         )
SECURITY,                      )
                               )
          Defendant.           )

## MEMORANDUM AND ORDER

This action was instituted by the Plaintiff pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the Plaintiff a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382. Pending before the Court are: (1) Plaintiff's motion for judgment on the pleadings [Doc. No. 14] and (2) Defendant's motion for summary judgment [Doc. No. 17].

For the reasons stated herein: (1) Plaintiff's motion for judgment on the pleadings [Doc. No. 14] will be **DENIED**; (2) Defendant's motion for summary judgment [Doc. No. 17] will be **GRANTED**; (3) the decision of Commissioner will be **AFFIRMED**; and (4) this action will be **DISMISSED**.

## Administrative Proceedings

Plaintiff filed applications for DIB and SSI alleging disability as of June 19, 2002, due to his blood pressure, epilepsy, and mental illnesses (Tr. 119-21, 130, 706-09). Plaintiff's claims were denied initially and upon reconsideration (Tr. 103-06, 109-10, 710-13, 715-16). Following three

administrative hearings, the ALJ denied Plaintiff's claims on December 14, 2004 (Tr. 19-26). The ALJ's decision became the final decision of the Commissioner on July 21, 2006, when the Appeals Council denied Plaintiff's request for review (Tr. 9-13).

## <u>Standard of Review</u>

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were unsupported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of

Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted).

## How Disability Benefits Are Determined

The Sixth Circuit recently reiterated the five-step procedure used by the Social Security Administration ("SSA") to determine eligibility for disability benefits as follows:

> The [Social Security] Act entitles to benefits payments certain claimants who, by virtue of a medically determinable physical or mental impairment of at least a year's expected duration, cannot engage in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A). Such claimants qualify as "disabled." *Id.* A claimant qualifies as disabled if she cannot, in light of her age, education, and work experience, "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). To identify claimants who satisfy this definition of disability, the SSA uses a five-step "sequential evaluation process." 20 C.F.R § 404.1520(a)(4). The five steps are as follows:

> In step one, the SSA identifies claimants who "are doing substantial gainful activity" and concludes that these claimants are not disabled. *Id.* § 404.1520(a)(4)(i). If claimants get past this step, the SSA at step two considers the "medical severity" of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. *Id.* § 404.1520(a)(4)(ii). Claimants with impairments of insufficient duration are not disabled. *See id.* Those with impairments that have lasted or will last at least twelve months proceed to step three.

> At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. *Id.* § 404.1520(a)(4)(iii). Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. *Id.* § 404.1520(a)(4)(iii), (d). The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. *See Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed. 2d 967 (1990). A person with such an impairment or an equivalent, consequently, necessarily

satisfies the statutory definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.

In the fourth step, the SSA evaluates claimants' "residual functional capacity," defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Claimants whose residual functional capacity permits them to perform their "past relevant work" are not disabled. *Id.* § 404.1520(a)(4)(iv), (f). "Past relevant work" is defined as work claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(1). Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform "substantial gainful activity" other than their past relevant work. *See id.* § 404.1520(a)(4)(v), (g)(1). Claimants who can perform such work are not disabled. *See id.;* § 404.1560(c)(1). The SSA bears the burden of proof at step five. *See Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 474 (6th Cir.2003).

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).

## **ALJ's Findings**

The ALJ made the following findings in support of Commissioner's decision, which are conclusive if they are supported by substantial evidence in the record:

1. The claimant meets the disability insured status requirements of the Act through at least the date of this decision.

2. The claimant has not engaged in substantial gainful activity since June 19, 2002.

3. The claimant has "severe" impairments, as described in the decision, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints are not entirely supported by the medical record and are not fully credible.

5. The claimant has the residual functional capacity to perform a reduced range of light work, i.e., he cannot work around moving machinery or unprotected heights, he is limited to unskilled work requiring the performance of only simple 1 and 2-step procedures, he cannot perform work requiring production quotas, and he cannot perform work involving frequent contact with the general public.

6. The claimant is unable to perform any past relevant work and has no transferable work skills.

7. The claimant is 45-years old, which is defined as a younger individual.

8. The claimant has a 5th grade education.

9. Based on an exertional capacity for light work and the claimant's age, education, and work experience, 20 CFR §§ 404.1569 and 416.969 and Rule 202.18, Appendix 2, Subpart P. Regulations No. 4 would direct a conclusion of "not disabled."

10. Although the claimant's additional nonexertional limitations do not allow the claimant to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national and regional economies which the claimant could perform. Examples and numbers of such jobs were identified by a vocational expert at the hearing.

11. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 25).

## Issues Presented by Plaintiff

Although somewhat difficult to discern, it appears the Plaintiff makes the following three arguments in support of this action:

1. Whether the ALJ erred in permitting and/or accepting the testimony of Dr. Richard Hark as a medical advisor?

2. Whether the ALJ erred in finding Plaintiff did not satisfy the requirements of listing 12.04?

3. Whether the ALJ erred in finding Plaintiff could perform a significant number of jobs despite the limitations to his residual functional capacity imposed by his physical and mental impairments?

[Doc. No. 14-2 at 2-3].

## Review of Evidence

### A. *Plaintiff's Age, Education, and Past Work Experience*

Plaintiff was forty-five years of age when the ALJ denied his claims (Tr. 19). He had a fifth grade education (*id.*). Plaintiff's work history includes jobs as a spray painter and as a laborer (*id.*). Plaintiff stopped working at the time of his alleged onset date in June 2002 (*id.*).

### B. *Medical Evidence*

#### 1. Physical

Plaintiff was seen by Charles Hughes, M.D. on May 29, 1984, as the result of a vocational referral (Tr. 549-51). Dr. Hughes' impression was idiopathic seizures, under good control (Tr. 550). Sharon Farber, M.D. saw Plaintiff on July 22, 1994 (Tr. 547-48). Based upon a history and neurological examination, Dr. Farber's impression was possible seizure disorder (Tr. 548).

Apparently after a work injury to his left wrist in October of 1997, Thomas J. Payne, III, M.D. interpreted x-rays of Plaintiff's left wrist taken on October 13, 1997 (Tr. 612-13) and November 3, 1997 (Tr. 608) as being negative. Various x-rays of Plaintiff's left or right hand were taken from October 1997 through December 1998 (Tr. 324-328, 624), and they showed no fracture, although they did show a deformity of the 5th metacarpal of Plaintiff's right hand secondary to a previous fracture (Tr. 324-25).

Robert Mastey, M.D. saw Plaintiff in 1998 for complaints of left wrist pain and finger stiffness (Tr. 669-71). His impression was left wrist sprain improved; left wrist flexor tenosynovitis,

slowly improving; left dorsal wrist extensor synovitis – occasionally painful nodule of the extensor tendons to the index finger; and left index finger snapping radial lateral band (*id.*).  Dr. Mastey limited Plaintiff to no grabbing or lifting greater than ten pounds and no repetitive motion until further notice (*id.*).

An x-ray of Plaintiff's lumbar spine was taken on January 30, 1999, after he complained of a back injury due to a fall (Tr. 383).  Larry Killen, M.D. interpreted the x-ray as showing mild hypertrophic changes in the lumbar spine (*id.*).  He also observed minimal wedging of T12, which he stated was likely to be old (*id.*).

Following a right hand injury, an x-ray of Plaintiff's right hand was taken on February 14, 1999 (Tr. 380).  C. A. Kyle, III, M.D. interpreted the x-ray as showing no evidence of an acute fracture or subluxation (*id.*).  He also stated there was bony irregularity of the proximal 5th metacarpal bone which was consistent with an old fracture (*id.*).  An x-ray of Plaintiff's right hand taken on March 12, 1999 (Tr. 377) received a tentative diagnosis of "contusion right hand injury" (Tr. 377).  Roger Miller, M.D. stated no acute fracture or dislocation was seen and the bone density appeared normal (*id.*).

X-rays of Plaintiff's skull and right forearm were taken on April 16, 1999 (Tr. 386).  Kenton Hamilton M.D. interpreted the skull x-rays as being negative (*id.*).  Dr. Hamilton also interpreted the x-ray of Plaintiff's right forearm to be negative (*id.*).  Handwritten medical records from the Bradley Memorial Hospital on that date indicate Plaintiff was in an altercation (Tr. 384). An accompanying report, on which the signature is illegible, diagnoses depression (Tr. 387).

Larry Collins, M.D. interpreted an x-ray of Plaintiff's face taken on June 14, 1999, as showing a contusion left eye/face injury (Tr. 374).  Dr. Collin's impression was there was left

infraorbital soft tissue edema, but that no obvious fracture of the left orbit or zygomatic arch could be seen (Tr. 374).

An x-ray taken at Bradley Memorial Hospital on October 23, 1999, was interpreted by Dr. Collins as showing a right hand laceration (Tr. 369). Dr. Collins stated there was soft tissue edema but not an obvious fracture (Tr. 369).

A chest x-ray was taken on November 30, 1999 (Tr. 427). The tentative diagnosis was right flank injury (*id.*). Dr. Killen interpreted the x-ray as being negative (*id.*).

Plaintiff was seen at Bradley Memorial Hospital on December 8, 1999 (Tr. 415). He stated he was assaulted the previous evening (*id.*). X-rays of Plaintiff's chest, skull and spine were interpreted by Dr. Kyle (Tr. 420-21). Dr. Kyle interpreted the x-rays of Plaintiff's chest and skull as negative (Tr. 420). He interpreted the x-ray of Plaintiff's spine as showing a questionable tiny occult fracture of the superior endplate of T12 and suggested a bone scan might be helpful for further study (Tr. 421).

A report of chest and spinal x-rays of Plaintiff taken on December 12, 1999, unsigned by any physician, indicates a questionable tiny occult fracture of the superior endplate of vertabrae T12 (Tr. 316). The report also states a bone scan would be helpful (*id.*).

Plaintiff underwent a total body bone scan on January 6, 2000 (Tr. 314). Dr. Collins interpreted the scan as showing abnormal activity in the T10 vertebral body (*id.*). He stated this activity was of uncertain etiology and could be a degenerative change, even though it was a localized process with no additional activity in other vertebral bodies (*id.*). Dr. Collins also stated he could not exclude traumatic abnormality (*id.*). Dr. Collins stated the abnormal activity was at T10, not at T12 (*id.*).

Duc Nguyen, M.D. saw Plaintiff on May 1, 2000 for complaints of knee pain (Tr. 205). Plaintiff had a full range of motion of his knee (*id.*). Dr. Nguyen's impression was a medial meniscus tear (Tr. 206).

X-rays of Plaintiff's right hand were taken on August 23, 2000, after he sustained an injury to his right hand (Tr. 409). Dr. Collins interpreted the x-rays as showing dorsal soft tissue edema without an acute fracture (*id.*). Dr. Collins also stated there was an old deformity of the 5th metacarpal with chip fragments (*id.*).

On August 6, 2001, Plaintiff was seen by Dr. Marlene Catanese at Cleveland Community Hospital (Tr. 294-300). He had various non-specific complaints following a fall of about two feet from his porch into some rocks the previous evening (Tr. 294, 301). Dr. Brent A. Barrow interpreted multiple x-rays of Plaintiff's left shoulder as being normal (Tr. 301). Dr. Barrow also interpreted several x-rays of Plaintiff's right hand and wrist as being normal (Tr. 302).

A Volunteer Behavioral Health Care System ("VBHS") a/k/a Hiwassee Mental Heath Center progress note electronically signed by Judith Greene, MSN on November 9, 2001 diagnosed Plaintiff with mood disorder and stated his current Global Assessment of Functioning ("GAF") score was 52 (Tr. 485-87). Another VBHS progress note also electronically signed by Ms. Judith Greene on February 14, 2002, states Plaintiff reports continuing marital and financial stressors (Tr. 481). Plaintiff was diagnosed with mood disorder and his current GAF was 50 (Tr. 482).

Dr. Marlene Catanese saw Plaintiff at Cleveland Community Hospital on January 5, 2002 for hand injury/pain (Tr. 278-84). Plaintiff had punched a brick wall in anger (Tr. 279, 285). Dr. Barrow interpreted three x-rays of Plaintiff's left hand as being normal (Tr. 285).

Plaintiff was seen by Dr. Catanese at Cleveland Community Hospital on January 15, 2002,

for left shoulder pain (Tr. 269-76). A chest x-ray was interpreted by Dr. Lindsay H. Messinger, a radiologist, as showing no evidence of acute trauma and being within normal limits for Plaintiff's age group (Tr. 277).

On January 23, 2002, Dr. Catanese saw Plaintiff at the Cleveland Community Hospital for hand injury/pain after a transmission fell on the back of Plaintiff's left hand (Tr. 261-62, 268). Dr. Messinger interpreted x-rays of Plaintiff's left hand as showing soft tissue swelling with no bony abnormality (Tr. 268).

On August 4, 2002, Plaintiff was seen by Dr. Cay Berg at Cleveland Community Hospital for wrist injury/pain (Tr. 229). Plaintiff's left wrist had been injured as the result of a direct blow with a hammer (Tr. 230). An x-ray of the left wrist was interpreted by the radiologist Steve Alexander M.D. as being negative for acute fracture or dislocation (Tr. 238).

Glenda Knox-Carter, M.D. reviewed the record evidence and completed a physical residual functional capacity ("RFC") assessment on February 11, 2003 (Tr. 453-58). Dr. Knox-Carter indicated Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, could stand and/or walk with normal breaks for a total of about six hours out of an eight-hour workday, and could sit with normal breaks for about six hours out of an eight-hour workday (Tr. 454). Dr. Knox-Carter also indicated Plaintiff's ability to push and/or pull was unlimited beyond that set forth for his ability to lift and/or carry (*id.*). Dr. Knox-Carter found Plaintiff's impairments were severe, but fell short of the listings either singly or in combination; and, she further indicated that although Plaintiff claimed he had frequent seizures during his mental competency evaluation, the note of November 2002 indicated he had not experienced a seizure in years (Tr. 455). Dr. Knox-Carter indicated Plaintiff's allegations of pain were partially credible (Tr.

457).

Plaintiff was examined by William A Holland, M.D. on April 22, 2003 (Tr. 537). Plaintiff reported taking medication for hypertension since the age of 16 and a history of seizure activity. (*id.*). Plaintiff also reported a history of daily headaches (*id.*). Based upon a history and physical examination (Tr. 537-38), Dr. Holland stated he was unable to find any actual physical limitations (Tr. 539, 540). He stated Plaintiff could work eight hours out of an eight hour day doing a combination of sitting, standing and walking. He also stated Plaintiff could lift, push or pull 15-20 pounds on a regular basis and up to 40 pounds occasionally (*id.*).

Robert Doster, M.D. completed a physical RFC assessment of the Plaintiff on May 5, 2003 (Tr. 541-46). Dr. Doster stated Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk, with normal breaks, for about six hours out of an eight hour workday and sit, with normal breaks, for about six hours out of an eight hour workday (Tr. 542). Dr. Doster also indicated Plaintiff should avoid all exposures to hazards, such as machinery and heights, due to his seizure disorder (Tr. 544).

An arterial evaluation of Plaintiff's lower extremities was performed on July 29, 2003 (Tr. 582). The assessment was excellent blood flow into both legs and extending into the feet and great toes (*id.*). A July 31, 2003 handwritten note on a prescription form signed by Alicia Hall, M.D. appears in the record (Tr. 590). The note states that Dr. Hall is not certain what Plaintiff is still able to do despite his impairment (*id.*).

Dr. Robert Mastey, M.D. examined Plaintiff on March 8, 2004, for purposes of a workers' compensation claim (Tr. 719). A musculoskeletal examination found a full range of motion of Plaintiff's cervical spine and a functional range of motion of the shoulders, elbows and right wrist

(*id.*).  The left wrist had a decreased range of motion and the fingers had a slight decreased range of motion in all directions (*id.*).  There was normal sensation of the fingertips and there was no discernible swelling of the left hand (*id.*).  Three x-rays of the left hand were found to be essentially normal and showed no abnormalities (*id.*).  Dr. Mastey's impression was a bout of recurrent left hand swelling and pain (*id.*).  Dr. Mastey commented this may represent synovitis, but there was no definite evidence at the time of the examination.  Dr. Mastey's report also indicated a work excuse concerning Plaintiff's left hand, including: (1) no lifting or grabbing greater than two pounds and (2) no repetitive motion at this time (*id.*).  Dr. Mastey's treatment note indicates Plaintiff did not keep appointments on April 19, 2004, May 3, 2004, and May 5, 2004 (*id.*).

### 2.  Mental

Plaintiff was seen at Bradley Memorial Hospital on July 22, 2001.  (Tr. 336-39).  The initial reports signed by Jo Ann Smith, a nurse, indicate Plaintiff cut his left forearm with a knife (Tr. 336).  Plaintiff stated he lost his temper due to family problems, but he denied wanting to kill himself (*id.*).  Dr. Burdick's clinical impression was depression (Tr. 338).

A crisis team assessment from VBHS, dated July 22, 2001, diagnosed Plaintiff with a mood disorder (Tr. 491-98).  The note is initialed by one of the mental health center staff (Tr. 499).

Janet Coombs, M.D. saw Plaintiff at the emergency department of Bradley Memorial Hospital in Cleveland, Tennessee on February 17, 2002 (Tr. 218).  Plaintiff cut his left forearm following a family altercation (*id.*).  Plaintiff denied any suicidal intentions (*id.*).  Plaintiff's forearm was sutured and he was kept overnight at the hospital due to concerns about compartment syndrome (*id.*).

A VBHS progress note created by Ms. Greene and electronically signed by Troy Gilson,

MSN on March 27, 2002, states that Plaintiff reported his medication had helped him regain control of his temper (Tr. 478, 480). Plaintiff complained his spouse was good to everyone except him and he stated he had been sleeping well until he and his spouse began fighting (*id.*). The Axis I diagnosis was mood disorder due to general medical condition with depressive features (Tr. 479). Plaintiff's current GAF was 50 (*id.*).

A VBHS progress note created by Ms. Greene on May 8, 2002, states that Plaintiff's depression and angry outbursts had been decreased (Tr. 475). The working diagnosis states that Plaintiff's spouse told him she would divorce him (*id.*). The note stated Plaintiff's GAF was 58 (*id.*). Plaintiff stated his medication was helping him and he had only one episode of suicidal ideas (*id.*). The note further stated there was no evidence of psychosis (Tr. 476). The Axis I diagnosis was mood disorder due to general medical condition with depressive features (*id.*). The note also stated Plaintiff's GAF was 52 and his highest GAF in the past year was 70 (*id.*).

A VBHS progress note by Ms. Greene for a session held on June 19, 2002 states Plaintiff has a mood disorder due to general medical condition with depressive features (Tr. 471-72). The progress note states Plaintiff appears obese (*id.*). The note again states Plaintiff's previous GAF was 52 and his highest GAF for the past year was 70 (Tr. 472-73).

A progress note from VBHS dated October 10, 2002, lists Russell Mabry as the treating professional (Tr. 467-70). The progress note indicates Plaintiff underwent an evaluation on January 25, 2002 and that his current and lowest GAF for the past six months was 52 and his highest GAF for the past six months was 70 (Tr. 468)

A psychological evaluation of Plaintiff was performed on November 20, 2002 (Tr. 430-35). The report is signed by both Vijai P. Sharma, Ph.D. and Thomas M. Megir, Ph.D. (Tr. 435).

Plaintiff underwent both a structured clinical interview and a mental status examination. Plaintiff was described as cooperative (Tr. 430). The Axis I diagnosis was: Major Depressive Disorder, recurrent and severe with psychotic features, mood congruent with hallucinations; Panic Disorder with Agoraphobia; and Pain Disorder associated with psychological factors (Tr. 434). The Axis II diagnosis was borderline and other mixed personality features (Tr. 435). The Axis III diagnosis was seizure disorder and epilepsy (hypertension, back problems, arthritis, reported knee problems) (*id.*). The Axis IV diagnosis was psychosocial stressors: health care access, finances, social environment, and work (*id.*). The Axis V diagnosis indicated Plaintiff's GAF within the past year was 32 to 42 and his GAF was 32 to 42 (Tr. 435).

At the request of the state agency, Edward L. Sachs, Ph.D. completed a mental residual functional capacity ("RFC") assessment on December 9, 2002 (Tr. 436-38). Dr. Sachs indicated Plaintiff could perform simple and low level detailed tasks over a full workweek, could interact infrequently or one-on-one with the general public and meet basic social demands in work setting, and could adapt to gradual or infrequent changes (Tr. 438). Dr. Sachs also completed a Psychiatric Review Technique Form ("PRTF") on December 9, 2002 concluding Plaintiff did not have a listing level impairment (Tr. 439-452). Dr. Sachs indicated his PRTF was based upon category 12.04, affective disorders (Tr. 439). With regard to the "B" criteria of listing 12.04, Dr. Sachs indicated Plaintiff had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and had no episodes of decompensation of extended duration (Tr. 449). With regard to the "C" criteria of listing 12.04, Dr. Sachs placed an "x" on the form indicating the evidence did not establish the presence of the "C" criteria (Tr. 450).

Plaintiff was seen by Floyd C. Cooper, M.D. on February 18, 2004 (Tr. 675-76).[1] Plaintiff told Dr. Cooper he had panic attacks when he left his home, had problems controlling his temper, had a tendency to explode, and was depressed (Tr. 675). He told Dr. Cooper he had overdosed approximately two years before, but he denied any current suicidal ideation (*id.*). Plaintiff also told Dr. Cooper his wife was on disability and he was applying for disability (*id.*). Dr. Cooper noted Plaintiff's past medical illnesses included grand mal epilepsy, post trauma at age 17 and morbid obesity. Dr. Cooper noted in the margin of his report that Plaintiff was 5'7" in height and weighed 255 pounds (*id.*). Dr. Cooper noted Plaintiff appeared anxious and had poor hygiene (Tr. 676). Dr. Cooper's diagnosis was Axis I, bipolar disorder with psychotic features and agoraphobia with panic attacks; Axis II, borderline [unintelligible]; and Axis III, history of grand mal epilepsy, post-traumatic due to auto accident (*id.*). Dr. Cooper prescribed Zoloft, Valium and Seroquel (*id.*).

As a result of the medical advisor's recommendation at the June 2004 administrative hearing, Plaintiff was referred to a psychologist for evaluation. A consultive psychological evaluation of Plaintiff was performed on July 28, 2004 by Benjamin Biller, MS, under the supervision of psychologist James Milliron, Ph.D. (Tr. 677-82). Based upon a history and a number of tests (Tr. 680), Plaintiff was found to have a verbal IQ of 75, a performance IQ of 74 and a full scale IQ of 72 (Tr. 681). The results of the Pfeiffer Mental Status Evaluation indicated Plaintiff was poorly oriented as to time, place and person (*id.*). Plaintiff was described as having a mild difficulty recalling information (*id.*). The diagnostic impression was: Axis I, major depressive disorder, recurrent, severe with psychotic features and panic disorder with agoraphobia; Axis II, diagnosis

---

[1] Dr. Cooper's two page treatment note is handwritten (Tr. 675-76). As such, parts of the note are unintelligible.

deferred; Axis III, (Reported) seizures, high blood pressure, carpal tunnel, back pain, neck pain, head injuries, recurrent headaches; Axis IV, problems with primary support group, problems related to social environment, educational problems, occupational problems, housing problems, economic problems, problems related to interaction with legal system/crime; and Axis V, current GAF of 45 (Tr. 681-82).

The summary and recommendations stated Plaintiff did not appear to have the ability to understand and remember locations and work-like procedures, to understand and remember simple and/or detailed instructions, and to interact with peers and supervisors in a standardized work setting. Plaintiff did appear to have the ability to sustain concentration, to be persistent with work processes and to adapt to changes in the work environment, to be aware of hazards, to travel unaccompanied in unfamiliar places, or to use public transportation (*id.*). Dr. Milliron/Mr. Biller also commented that if awarded benefits, Plaintiff would not likely be able to manage his own funds without help from family members (*id.*).

Mr. Biller/Dr. Milliron also completed a medical source statement as to Plaintiff's mental ability to do work-related activity (Tr. 684). Plaintiff's ability to understand and remember short, simple instructions; to carry out short, simple instructions; and to make judgments on simple work-related decisions was described as slightly impaired (Tr. 684). Plaintiff's ability to understand and remember detailed instructions and to carry out detailed instructions was described as moderately impaired (*id.*). Plaintiff's ability to interact appropriately with supervisors, interact appropriately with co-workers and respond appropriately to changes in a routine work setting were also described as slightly impaired (Tr. 683). Plaintiff's ability to interact appropriately with the public and to respond appropriately to work pressures in a usual work setting were described as moderately

impaired (*id.*).

## C. Hearing Testimony

### 1. The March 11, 2004 Hearing

The first of three administrative hearings was held on March 11, 2004 (Tr. 48).  Plaintiff and vocational expert ("VE") Rodney Caldwell testified at this hearing.

Plaintiff testified he was born in February 1959 (Tr. 50).  He completed the fifth grade and attended the sixth grade, but did not complete it (*id.*).  Plaintiff can read and write a little, but not much (*id.*).  Plaintiff testified he had difficulty reading even simple statements and that his wife did most of his reading to him (Tr. 50-51).  Plaintiff last worked on June 19, 2002 (Tr. 51).  His last work involved painting farm equipment (Tr. 52).  He also spent 16 years working in construction operating a jackhammer (*id.*).  Plaintiff testified he walked out of the last several jobs he had (Tr. 53).  He stated he would get mad and go home (*id.*).  Plaintiff stated he was laid off from the spray-painting job (*id.*).  Plaintiff testified when he was working in the spray-painting job he went home many times, but they let him come back to work (*id.*).

Plaintiff testified in the work setting he gets upset and nervous and loses his temper (Tr. 54).  Plaintiff stated he hears voices in his head, mostly when he injures himself (*id.*).  Plaintiff testified he had lost all pleasure in life and spent most of his day on the couch watching TV (Tr. 54-55).  Plaintiff testified he had problems sleeping (Tr. 55).  Plaintiff also stated he lost his temper often, had trouble learning and concentrating, and had trouble getting along with people (Tr. 55-56).

Plaintiff testified he had problems with his hands and had lost his ability to grip and close his hands (Tr. 58).  He stated he could not hold anything with his left hand (*id.*).  Plaintiff stated he received workers compensation benefits based upon an injury he suffered to his left hand in the

1990s (Tr. 58-59).

VE Caldwell testified Plaintiff's past work as a construction laborer was unskilled work performed at the heavy exertion level (Tr. 53). VE Caldwell also stated Plaintiff's past work spray-painting farm equipment was semi-skilled work at the medium level of exertion with an SVP of 4 (*id.*).

## 2. The Second Administrative Hearing

The second administrative hearing was held on June 24, 2004 (Tr. 64). Plaintiff also testified during this hearing. Rodney Caldwell again testified as a VE and Richard Hark, Ph.D. testified as a medical advisor/expert ("ME") at this hearing.

The ME testified he had reviewed the medical evidence in the case and was familiar with the listing of impairments (Tr. 66-67). The ME had reviewed the single report in the record from Dr. Cooper, a psychiatrist who saw Plaintiff in February 2004 (Tr. 67-68 and also the treatment notes from Hiwassee mental health (Tr. 68). The ME stated the diagnosis consistently used in those records was mood disorder due to general medical condition; namely, obesity and headaches (*id.*). He stated the counselors who examined Plaintiff for Hiwassee assigned him a GAF score ranging from the 50s to the 70s, which indicated moderate to mild symptoms (*id.*).

The ME stated he also reviewed Dr. Sharma's mental status examination of November 2002 (*id.*). He stated Dr. Sharma did not observe any symptoms of psychotic thoughts and diagnosed Plaintiff as having a major depressive disorder, recurrent and severe, with psychotic features (*id.*). The ME stated he believed Dr. Sharma diagnosed pyschotic features based solely on the history given by Plaintiff because there was no evidence of them during the mental status examination (*id.*).

The ME testified there was not enough clinical data to indicate whether or not Plaintiff met

or equaled a listing (Tr. 69). The ME recommended Plaintiff should be evaluated by a psychologist who should administer an IQ test, academic achievement testing, and an emotional assessment (Tr. 69).

Plaintiff testified he had seen Dr. Cooper three times (Tr. 70). Plaintiff also stated he worked for a total of 16 years in construction and the majority of that work involved using a jackhammer (Tr. 73).

VE Caldwell also testified at the second hearing stating his testimony about the nature of Plaintiff's work would be the same as his testimony at the first hearing (Tr. 73).

### 3. The Third Administrative Hearing

Plaintiff was present at the third administrative hearing on November 18, 2004, but did not testify. Ben Johnston testified at the third hearing as the VE. Dr. Hark again testified as the ME at the third hearing (Tr. 84).

VE Johnston testified about Plaintiff's past relevant work (Tr. 85). He stated his testimony about Plaintiff's past relevant work would be identical to VE Caldwell's testimony at the two previous administrative hearings (Tr. 85).

The ME testified he had reviewed the medical evidence in the record and he was familiar with the listing of impairments in the regulations (Tr. 86). The ME testified Plaintiff failed to keep about one-third of his appointments at Hiwassee Mental Health (*id.*). The ME further testified that during Plaintiff's treatment at Hiwassee Mental Health from 2000 to 2003, no one ever observed Plaintiff displaying psychotic thinking (*id.*). The ME also testified that, although Dr. Sharma stated in November 2002 Plaintiff had major depression with psychotic features, there is no evidence that Dr. Sharma observed Plaintiff display psychotic features (Tr. 87). He also stated Dr. Sharma

assigned Plaintiff a GAF which ranged from 32 to 42, which was significantly different and lower than the GAF assigned in the Hiwassee Mental Health Center records (*id.*). The ME described Dr. Sharma's evaluation as simply reiterating what Dr. Sharma had been told by Plaintiff (*id.*).

The ME also testified that Dr. Milliron's July 2004 psychological evaluation noted Plaintiff displayed no bizarre behavior, only normal behavior, but then stated Plaintiff did not have a firm grasp on reality, which contradicted his earlier observations (*id.*). He stated Dr. Milliron never explained what he meant by lacking a firm grasp on reality (*id.*). The ME stated that Dr. Milliron found Plaintiff had a low IQ, 72, which explained his limited fund of knowledge and limited reading skills (*id.*).

The ME also reviewed the February 2004 evaluation by Dr. Cooper (Tr. 88). The ME stated that Dr. Cooper opined Plaintiff had command hallucinations, a diagnosis not supported by anything in the record (*id.*). He also stated Dr. Cooper diagnosed Plaintiff as having a bipolar disorder 2, but that no other mental health provider of record had ever made a diagnosis of bipolar disorder (*id.*).

The ME testified that, based upon his review of the medical evidence, Plaintiff satisfied the A criteria of listing 12.04, but Plaintiff did not satisfy the B criteria of the listing (*id.*). The ME testified Plaintiff did not meet the B criteria of the listing because "[t]here's no evidence that he has had any kind of psychotic episodes and decompensated. He reports somewhat limited daily living skills, but again it's just simply by report and not at the marked or severe level..." (*id.*). The ME further testified that, based upon the testing of the psychologists and psychiatrists, Plaintiff would "be limited to work that would require very simple, unskilled types of activities and nothing detailed, nothing where he would have to meet a severe production quota, and perhaps work where he might avoid totally frequent contact with the public." (*Id.*).

The ME testified he did not disagree with Dr. Milliron's conclusion Plaintiff would have problems performing work that involved carrying out detailed instructions because of his low IQ and depression (Tr. 89). The ME further stated he did not disagree that Plaintiff would have some limitations on his ability to interact with peers and supervisors in a standardized work setting (*id.*). The ME also stated there was no evidence Plaintiff would have marked difficulty in maintaining concentration persistence and pace and the ME also testified there was no evidence Plaintiff had repeated episodes of decompensation in the workplace (Tr. 90).

The ME also stated his testimony did not take into consideration any of Plaintiff's physical limitations or the medications Plaintiff was taking (Tr. 91). When told Plaintiff was taking Zoloft, Valium, Seroquel and Lotensin, the ME stated those medications would not affect Plaintiff's limitations unless he was overmedicating or having an untoward reaction to the medication (Tr. 92).

The ME further stated that, based on the medical evidence he had reviewed, there was no evidence Plaintiff had marked limitations of activities of daily living (*id.*). The ME stated he specifically disagreed with Dr. Sharma's conclusion that Plaintiff had severe major depressive disorder with psychotic features or that Plaintiff had agoraphobia, a severe panic disorder (Tr. 93). The ME also indicated he did not agree with the GAF that Dr. Sharma assigned to Plaintiff on the ground it did not agree with the other GAF scores assigned to Plaintiff throughout the record (*id.*).

The ME opined Plaintiff meets or equals the A criteria of listing 12.04, but not the B criteria of that listing (*id.*). The ME further stated Plaintiff did not meet or equal any one of the four categories in the B criteria of listing 12.04 (Tr. 94).

After the ME concluded his testimony, the VE completed his testimony at the third hearing. In response to a hypothetical concerning an individual of Plaintiff's age, education and work

experience, who had the RFC to perform a reduced range of light work, but could not work around moving machinery or unprotected heights, was limited to simple one- or two- step procedures, could not work at a job requiring a production quota, and would have to avoid frequent contact with the general public, the VE testified there were jobs which such a hypothetical individual could perform (Tr. 96). In response to the ALJ's request that the VE identify two examples of such jobs, the VE identified positions as an office cleaner doing light janitorial-type work and a car detailer – cleaning up automobiles (*id.*).

The VE further testified in response to a question from the ALJ that if the hypothetical individual described above also had a restriction limiting his lifting with his dominant right hand to two pounds or less, such an individual could perform only extremely limited kinds of work which would not be in the range of jobs which were readily available in the national economy (Tr. 96-97). Finally, the VE testified that if the hypothetical individual also suffered from severe psychological limitations to the extent he would be unable to concentrate or attend to a task, he could not perform either his past work or any work existing in significant numbers in the national economy (Tr. 97).

## Analysis

### A.     *The Weight Given to the ME's Opinion*

Plaintiff asserts the ALJ erred in accepting and crediting the testimony of the ME over the assessment of Plaintiff's treating physician, Dr. Cooper. [Doc. No. 14-2 at 2]. Plaintiff further asserts the ALJ erred in accepting the testimony of the ME because the ME was not an M.D. [*id.*]. In his brief in support of his motion for judgment on the pleadings, Plaintiff states:

> On page 20 of the record, ALJ Gordon reiterates the findings of one Dr. Hark (Dr. Hark appeared only as a voice on a telephone throughout the hearings). Dr. Hark, not an M.D., was allowed to comment on medical evidence (p. 93) and disagreed with the treating

psychiatrists' diagnosis – an extraordinary stretch at qualifications. On page 21 of the record Judge Gordon points out that Dr. Hark agreed with some of fellow psychologists Dr. Sharma's findings and disagreed with others. Dr. Hark agreed with the diagnosis of major depression but disagreed with the assessment of psychotic features – Dr. Hark went on to disagree with treating physician Dr. Floyd C. Cooper's (psychiatrist) diagnosis of psychotic features and agoraphobia – not only this but Dr. Hark speculated on what should have been in the treating notes) (record p. 21). . . This leaves the ALJ in the untenable position of justifying his opinion not only with non-treating testimony, but with testimony of a witness who never even saw the claimant (record p. 86) nor ever appeared by letter or in person.

[*Id.*].

In his decision, the ALJ made the following relevant statements concerning the ME's testimony:

In assessing the impact of the claimant's mental health condition on his residual functional capacity, I am aided by the fact that Dr. Richard D. Hark, testified as an impartial medical adviser at the June 24, 2004 and November 18, 2004 hearings.

On June 24, 2004, Dr. Hark testified he had reviewed the claimant's medical record, which included treatment records from November 2000 to February 2003. The treatment records, according to Dr. Hark, showed the claimant was treated for a mood disorder associated with a general medical condition. The claimant was treated at Hiwassee Mental Health Center. Dr. Hark testified the claimant failed to show for a number of appointments . . . and was seen by a counselor or registered nurse and not by a psychologist or psychiatrist.

Dr. Hark further testified he also reviewed the results of an evaluation by Dr. Floyd C. Cooper, a psychiatrist, on February 18, 2004. He noted although Dr. Cooper assessed bipolar II disorder with psychotic features and agoraphobia with panic attacks, Dr. Cooper did not observe or note any psychotic features or features of agoraphobia during the actual evaluation. Accordingly, Dr. Hark testified Dr. Cooper based these diagnostic impressions on reports made by the claimant and not on actual observations or clinical data. Further, Dr. Hark noted the claimant had not taken his medications during the

month prior to the evaluation of February 18, 2004. Although the claimant testified he had seen Dr. Cooper on 3 - occasions and was given an opportunity to submit the treatment records, the documented medical record before me reflects the single evaluation.

Dr. Hark testified the claimant had also been evaluated by Vijai P. Sharma, Ph.D., on November 20, 2002. Dr. Sharma, while performing a consultative evaluation, described the claimant's thought processes as coherent and he was well-oriented and he had a clear conscious. Dr. Sharma assessed major depressive disorder, recurrent, severe, with psychotic features (mood congruent with hallucinations) and panic disorder with agoraphobia. Again, Dr. Hark testified the assessment of psychotic features, hallucinations and agoraphobia were based on reports by the claimant and were not based on observations during the evaluation. In fact, Dr. Hark stated the claimant's mental health record of evidence documented no observations by treating sources of hallucinations or psychotic features. Dr. Hark testified the GAF measures of 32-42 assigned by Dr. Sharma were not supported by his evaluation or clinical data. Dr. Hark concluded his testimony, on June 24, 2004 by recommending the claimant be referred for a psychological evaluation to include specific psychological tests.
. . .
Dr. Hark testified Dr. Sharma's consultative evaluation, performed on November 21, 2002, included no clinical testing, the claimant's thoughts were described as coherent and the global assessment of functioning measures of 32-42 were not supported by the evaluation. Dr. Hark agreed with the diagnosis of major depression but disagreed with the assessment of psychotic features and agoraphobia.
. . .
Additionally, Dr. Hark, again reviewed the single evaluation of Dr. Floyd C. Cooper which was performed on February 18, 2004. Dr. Hark testified although the claimant may have a bipolar disorder there was no evidence of psychotic features other than those reported by the claimant. He stated in the course of the 3-years of treatment, the psychosis would have been documented/observed by the counselor or registered nurse who treated the claimant.

Dr. Hark stated the claimant met the Part A requirement of Medical Listing 12.04. However, Dr. Hark testified the claimant did not meet the Part B requirements of the listing, i.e., he did not experience "marked" limitations or "repeated episodes of decompensation, each of extended duration." Dr. Hark testified the claimant was only "moderately" limited by his mental health condition and could do simple, unskilled work which would not require frequent contact with

the general public or production quotas.  I find Dr. Hark's testimony
supported by the longitudinal record of evidence before me and by his
opportunity to review the entire mental health record of evidence.  I
further find Dr. Hark's testimony consistent with the state agency
expert review consultant opinion, indicating the claimant is only
moderately limited by his affective disorder.  Accordingly, I have
assigned Dr. Hark's testimony and his opinion considerable weight.

(Tr. 20-22) (internal citations omitted).

Plaintiff agues the ME was a psychologist, a Ph.D., and not an psychiatrist, an M.D., and,

therefore his opinion should have been entitled to lesser weight.  However, a psychologist's opinion

should not be accorded less weight than the opinion of a psychiatrist and, the psychologist's

assessment, if properly supported, will constitute substantial evidence.  *Crum v. Sullivan*, 921 F.2d

642, 645 (6th Cir. 1990).

In this instance, the ME testified as a non-examining expert with regard to Plaintiff's mental

RFC.  The use of a non-examining medical advisor or medical expert who testifies at the

administrative hearing is well accepted in social security cases.  *Richardson v. Perales*, 402 U.S. 389,

408 (1971).  The opinion of a non-examining physician can be accorded more weight than the

opinion or assessment of an examining physician "when the non-examining physician clearly states

the reasons that his opinions differ from those of the examining physicians."  *Lyons v. Soc. Sec.*

*Admin.*, 19 F. App'x. 294, 302 (6th Cir. 2001) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.

1994)).  If the non-examining medical advisor hears a claimant's testimony and examines the medical

evidence of record, the ALJ may properly rely on his conclusions.  *Foglesong v. Sec. of Health and*

*Human Servs.*, No. 93-5190, 1994 WL 58993, * 4 (6th Cir. Feb. 25, 1994) (per curiam).

Plaintiff correctly contends the ME testified only as a voice over the telephone at the June 24,

2004 and November 18, 2004 hearings [Doc. No. 14-2 at 2].  Plaintiff, however, has cited no case

law which states the ME cannot testify telephonically and must appear in person at an administrative hearing. Further, a review of the transcripts of the aforementioned hearings reveals that Plaintiff was given an opportunity to question the ME at those hearings. In his brief in support of his motion for judgment on the pleadings, Plaintiff has not identified how his counsel was in any way impeded or prevented from questioning or cross-examining the ME at either the June 24, 2004 or November 18, 2004 administrative hearing.

In his decision, the ALJ fully explained his reasons for accepting the ME's testimony as to the restrictions imposed by Plaintiff's mental impairments on his capacity for work over the opinions of the treating and/or consulting physicians of record. Applicable regulations state the Commissioner will evaluate every medical opinion and will consider the following factors in deciding what weight to give each opinion: examining relationship; treatment relationship; supportability; consistency; specialization; and other factors. 20 C.F.R. §§ 404.1527(d), 416.927(d). Although a treating physician's opinion typically is entitled to substantial deference, as argued by Plaintiff, the ALJ is not bound by that opinion. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). The Sixth Circuit has consistently stated the treating source's opinion is entitled to deference only if it is based on objective medical findings, *see, e.g.*, *Warner*, 375 F.3d at 390; *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993), *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985), and not contradicted by substantial evidence to the contrary. *Hardaway v. Sec'y of Health & Human Servs*., 823 F.2d 922, 927 (6th Cir. 1987).

If the treating source's opinion is not given controlling weight, its weight is determined by the same factors that are considered in evaluating every medical opinion. The ALJ must weigh the opinions of the acceptable medical sources, including the opinions of the treating physicians and the

state agency medical sources, as required by applicable regulations, and resolve inconsistencies between the acceptable sources. *See* 20 C.F.R. §§ 404.1527(d)(4), (f)(2)(i) and 416.927(d)(4), (f)(2)(i); *Mullins v. Sec'y of Health & Human Servs.*, 836 F.2d 980, 984 (6th Cir. 1987) ("Claimant's argument rests solely on the weight to be given opposing medical opinions, which is clearly not a basis for our setting aside the ALJ's factual findings."). With respect to weighting the opinions, the Sixth Circuit has held the opinion of a treating physician generally is entitled to greater weight than the contrary opinion of a consulting physician who has examined the claimant on only a single occasion. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997); *Hardaway*, 823 F.2d at 927. An ALJ may, however, discount a treating physician's opinion based on an opinion of an examining or a reviewing physician in appropriate circumstances. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993); *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990).

The responsibility for weighing the record evidence, including conflicting physicians' opinions, and resolving the conflicts rests with the ALJ. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). In addition, the ALJ must give good reasons for the weight given a treating source's opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x. 456, 461 (6th Cir. 2005).

The ALJ explained his reasons for crediting the ME's testimony over the opinions of Plaintiff's treating physicians. With regard to Dr. Cooper, the ALJ noted that, although Plaintiff asserted Dr. Cooper was a treating physician, a single report from Dr. Cooper appears in the record. Moreover, although Dr. Cooper diagnosed Plaintiff with bipolar disorder and agoraphobia (Tr. 676), his report says nothing about the severity of, or limitations imposed by, those conditions.

Further, the ME noted that Dr. Sharma's consultative evaluation included no clinical testing and, as such, Dr. Sharma's assessment of Plaintiff's GAF of 32 to 42 was not supported by his evaluation and differed notably from the other GAF scores assigned to Plaintiff throughout the record. The ME also noted that both Dr. Sharma and Dr. Cooper indicated that Plaintiff suffered from psychotic features based solely upon Plaintiff's own self-reporting and not based upon any observation of psychotic behavior.

The ME also noted the July 2004 psychological evaluation by Mr. Biller/Dr. Milliron was internally inconsistent in that their report indicated Plaintiff displayed no bizarre behavior, but then stated Plaintiff did not have a firm grasp on reality (Tr. 87). The ME also disagreed with the conclusions set forth in the medical source statement (Tr. 87-88). The ME stated that Mr. Biller/Dr. Milliron indicated Plaintiff would be unable to manage funds on his own without assistance, but their own observations and test data, including a full-scale IQ of 72, did not support such a conclusion (Tr. 88).

The ALJ further noted the ME was the only mental health professional who had reviewed all the evidence of record concerning the level of Plaintiff's mental functioning and that the ME's conclusions were more in line with the evidence of record, than the assessment of either Dr. Sharma or Mr. Biller/Dr. Milliron. Thus, and particularly given the situation that only a single evaluation from Plaintiff's alleged treating mental health professional, Dr. Cooper, appeared in the record, the ALJ accorded more weight to the ME's testimony/assessment.

In this case, the ALJ followed the appropriate steps in deciding not to give controlling weight to the opinions of Plaintiff's treating physicians. *See Wilson*, 378 F.3d at 544. The ALJ applied the correct legal standard to weigh the opinions of the acceptable medical sources, as required by

applicable regulations, and appropriately resolved inconsistencies between the acceptable sources. *See* 20 C.F.R. §§ 404.1527(d)(4), (f)(2)(i) and 416.927(d)(4), (f)(2)(i); *Mullins v. Sec'y of Health & Human Servs.*, 836 F.2d 980, 984 (6th Cir. 1987) (per curiam) ("Claimant's argument rests solely on the weight to be given opposing medical opinions, which is clearly not a basis for our setting aside the ALJ's factual findings."). The ALJ's decision, as set forth in detail above, shows application of the regulatory framework and a thorough review of the evidence. Accordingly, I **CONCLUDE** the ALJ's decision to accept and credit the testimony of the ME and the weight given the ME's assessment is supported by substantial evidence in the record.

### B. *Listing 12.04*

Plaintiff contends the ALJ erred in finding he did not meet or equal the requirements of listing 12.04. In his brief in support of his motion for judgment on the pleadings, Plaintiff states:

> To make matters more confused Dr. Hark agreed claimant met the medical testing of 12.04 Part A but not Part B – the criteria of part B are subjective. On page 24 of the record ALJ Gordon explains how both A and B of listing 12.04 must be met but fails to explain why 12.04C which needs no conjunction wasn't met.

[Doc. No. 14-2 at 2].

For use at step three, the Commissioner has promulgated an extensive list of impairments. *See generally* 20 C.F.R. Part 404, Subpart P, Appx. 1. The list includes dozens of conditions, ranging from problems of the musculoskeletal system to skin disorders. *See id.* As a general rule, if the Plaintiff has an impairment that matches or is substantially equivalent to a listed impairment, the claimant is disabled *per se*. *Gambill v. Bowen*, 823 F.2d 1009, 1011 (6th Cir. 1987). It is Plaintiff's burden to prove his impairments meet or medically equal a listed impairment. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). To do so, he must present specific medical findings that his impairment

meets the applicable listing of impairments or present medical evidence that describes how his impairment is equivalent to a listed impairment. *Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001); *Land v. Sec'y of Health & Human Servs.,* 814 F.2d 241, 245 (6th Cir. 1986) (per curiam).

In order to meet the requirements of a listed impairment, a Plaintiff must meet all the elements of the listed impairment. *Hale v. Sec'y of Health & Human Servs.,* 816 F.2d 1078, 1083 (6th Cir. 1987) (per curiam) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (lack of evidence indicating the existence of all the requirements of a listing provides substantial evidence to support finding that claimant did not meet the listing)); *Hicks v. Comm'r of Soc. Sec.*, 105 Fed. Appx 757, 761 (6th Cir. Jul. 27, 2004). Substantial evidence exists to support a finding that the claimant does *not* meet the listing if there is a lack of evidence indicating the existence of all of the requirements of a listed impairment. *Hale,* 816 F.2d at 1083. It is not sufficient to come close to meeting the requirements of a listing. *See Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986) (per curiam) (decision to deny benefits affirmed where medical evidence *almost* establishes a disability under listing).

Listing 12.04, 20 C.F.R. Part 404, Subpt. P, Appx. 1, Listing 12.04 states:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met, when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A.    Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1.    Depressive syndrome characterized by a least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation, or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace, or
4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of a least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

In his decision, the ALJ stated with regard to the listings:

Review of the evidence reveals that the claimant has "severe" impairments under the criteria of Social Security Ruling (SSR) 96-3p, as will be discussed herein. However, the claimant has no impairments, singly or in combination, that meet or equal in severity the criteria of any listing at Appendix 1, Subpart P, Regulations No. 4.

(Tr. 20).

The ALJ also stated:

Guidance in the evaluation of mental impairments and their impact on an individual's ability to perform work activity is provided in the Regulations at 20 C.F.R. §§ 404.1520a and 416.920a. A special procedure describes diagnostic criteria for eight categories of listed mental impairments. Then once the diagnostic criteria are satisfied for an impairment(s), the "B" and/or "C" criteria are used to rate impairment severity. The claimant's mental impairments meet the diagnostic, or "A," criteria of listing 12.04.

Under the "B," or functional criteria of these listings, I find the claimant's impairments impose a moderate difficulty completing daily activities, a moderate difficulty maintaining appropriate social

interaction, and a moderate difficulty maintaining concentration, persistence, and pace. This will reasonably limit the claimant to the performance of unskilled work activity requiring the performance of simple 1 and 2-step procedures. Based on Dr. Hark's testimony, which I find well-supported, I further find the claimant must avoid frequent contact with the public and he cannot perform work requiring production quotas. There is no indication of episodes of deterioration or decompensation in a work or work-like setting and the "C" criteria of listing 12.04 are not evident.

(Tr. 24).

Contrary to Plaintiff's assertions, the ALJ did provide reasons for his findings that Plaintiff did not meet or equal the requirements of listing 12.04, including the "C" criteria of the listing. Federal courts generally agree an ALJ should provide a sufficient explanation for his or her step three conclusion when making a disability determination. *See, e.g., Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The purpose of the ALJ's explanation is to facilitate meaningful judicial review of the administrative decision. *See, e.g., Jones*, 364 F.3d at 505; *Scott*, 297 F.3d at 595; *Clifton*, 79 F.3d at 1009.

In *Bledsoe v. Barnhart*, 165 Fed. Appx 408, 410-11 (6th Cir. Jan. 31, 2006), Bledsoe challenged the adequacy of the ALJ's step three finding. The ALJ had found "'the medical evidence establishes that the claimant has "severe" impairments . . . , but that she does not have an impairment or *combination of impairments* listed in, or medically equal to the one listed in Appendix 1, Subpart P, Regulations No. 4.'" *Id.* (emphasis in original). The Sixth Circuit rejected Bledsoe's challenge to the sufficiency of the ALJ's finding, holding the ALJ did not err by not spelling out every consideration that went into the ALJ's step three analysis. *Id.* at 411. Rather, the Sixth Circuit stated:

The language of 20 C.F.R. § 404.1526 does not state that the ALJ must articulate, at length, the analysis of the medical equivalency

33

> issue. It states that the ALJ should review all evidence of impairments
> to see if the sum of impairments is medically equivalent to a "listed
> impairment." This is exactly what the ALJ did. The ALJ described
> evidence pertaining to all impairments, both severe and non-severe,
> for five pages earlier in his opinion and made factual findings. The
> ALJ explicitly stated that he considered the combination of all
> impairments even though he did not spell out every fact a second time
> under the step three analysis.

*Id.* Thus, the Sixth Circuit held there is no heightened articulation standard applied to the step three analysis where substantial evidence supports the ALJ's findings. *Id.* (citing *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986)).

Here, the ALJ's findings as to Listing 12.04 are supported by substantial evidence. With regard to listing 12.04, the ALJ went far beyond merely stating Plaintiff's condition did not satisfy any of the listings. The ALJ also specifically addressed the "C" criteria of listing 12.04 in his decision (Tr. 24). Plaintiff is correct that at the third administrative hearing on November 18, 2004, the ME testified Plaintiff satisfied the "A" criteria of listing 12.04, but not the "B" criteria of the listing and the ME stated the reasons for his conclusion that Plaintiff did not meet or equal the requirements of the "B" criteria (Tr. 88). The ALJ did not inquire of the ME and the ME did not testify as to whether Plaintiff satisfied the "C" criteria of the listing. However, when Dr. Sachs completed a PRTF based upon listing 12.04, he clearly indicated the evidence did not suggest the presence of the "C" criteria (Tr. 450). Dr. Sachs' PRTF form is the only evidence of record addressing the "C" criteria of listing 12.04. In his brief, Plaintiff has not identified any evidence of record which would support a finding the "C" criteria of listing 12.04 are met or equaled.

Accordingly, the ALJ's finding Plaintiff did not satisfy listing 12.04 is supported by substantial evidence in the record.

**C.      Substantial Evidence in Support of the ALJ's Decision**

Plaintiff asserts the ALJ's decision is not supported by substantial evidence. He first asserts

"the vocational specialist also did not substantiate the Commissioner's position." [Doc. No. 14-2 at

2]. Plaintiff also asserts:

> The record is replete with evidence of claimant's back injury, the best explanation being at page 314 (T10 and T-12 traumatic abnormalities) (see also pp. 383, 421). The effects of morbid obesity (Pt. 404, Subpt. P App. 1 Part A 1:00Q) and (1.04) vertebral fracture were never addressed by doctors in this case although the record clearly shows these conditions are present (severe obesity p. 462). This same obesity coupled with hypertension would have had him to meet Listing 9.09 (1999) Listing 9.09 (20 C.F.R. Part 404, Appx. 1 9.09) (1999) listing obesity with back problems and/or hypertension. This listing was deleted effective October 25, 1999 a time before which Claimant's problems began although he stopped working in June of 2002.
>
> In spite of the record recording a 20% impairment and a 60% disability (by court finding for workers comp). (Records p. 122, 123) to the left upper extremity, the ALJ disagreed with this impairment and relies on Dr. Holland, another non-treating physician . . .

[*id.* at 2-4].

In his decision, the ALJ stated in relevant part:

> Regarding the claimant's ability to perform the physical requisites of work, the medical record shows that he was referred for an impartial physical consultative examination, performed on April 29, 2003 by Dr. William A. Holland. Dr. Holland noted the claimant had hypertension which was treated by anti-hypertensives and there was no evidence of end organ damage. Further, the claimant was noted to have a history of seizure disorder which was treated with anti-seizure medication. The claimant also reported headaches, bilateral hand pain and low back pain. The musculoskeletal examination, however, showed a normal range of motion at the shoulders, elbows, wrists and hands with 5/5 grip strength bilaterally. The claimant had a normal range of motion at the hips, knees and ankles. Straight leg raise test was negative, there was no peripheral edema and the claimant's lumbar spine showed flexion to 90°, extension to 30 degrees and lateral flexion to 30 degrees bilaterally, with no scoliosis or spasm. Dr. Holland stated the claimant's seizures reportedly occurred about twice a month but based on his physical examination, he [Dr. Holland]

could not find any actual physical limitations. Dr. Holland stated the claimant could work eight hours out of an eight hour-workday; and could lift, push or pull 15-20 pounds on a regular basis and up to 40 pounds occasionally.

The medical record does show a note from Dr. Robert D. Mastey, dated March 8, 2004, stating the claimant could lift or grab "less than 2 pounds: with his left upper extremity. Dr. Mastey prescribed a Medrol Dose Pak. I do not find this assessment supported by any underlying treatment records. The treatment records show a history of treatment for a left wrist sprain/tenosynovitis <u>several years</u> prior to when the claimant alleges disability commenced, but there is no evidence, corresponding to his alleged onset date, which would substantiate such a severe limitation. Further, this conclusory statement is markedly inconsistent with Dr. Holland's examination findings, showing 5/5 grip strength, bilaterally.

Further, on May 5, 2003 Dr. Robert Doster, a state agency medical expert, reviewed the medical record and stated the claimant could perform medium work. Dr. Doster noted the medical record showed multiple visits to the emergency room relating to minor complaints such as toothaches and sometimes for self-inflicted wounds, accidental wounds, and complaints of seizures. However, Dr. Doster stated there was very little medical evidence of record concerning the claimant's allegations and a treating physician office visit, dated January 21, 2000, reported the claimant had not had seizures in about a year. Dr. Doster also relied on Dr. Holland's consultative examination findings. The claimant was noted to take an anti-convulsant and his hypertension was capable of medical management, according to Dr. Doster. Dr. Doster noted the claimant ceased performing substantial gainful activity on June 19, 2002 because he was "laid off" and he never went back to work.

(Tr. 22). Thus, the ALJ found the "claimant has limitations, primarily as a result of a seizure disorder, hypertension, and history of left wrist sprain/tenosynovitis, which restrict him to light work. I further find he cannot work around moving machinery or unprotected heights because of his seizure disorder." (Tr. 23). In addition, the ALJ found Plaintiff "has non-exertional limitations, primarily as a result of bipolar disorder/depression, which restrict him to unskilled work requiring the performance of only simple 1 and 2-step procedures. I further find he cannot perform work requiring

production quotas and he cannot perform work involving frequent contact with the general public." (Tr. 24).

Regarding certain of his physical impairments, Plaintiff asserts the ALJ failed to take into account his hypertension, obesity, back injury, and left hand impairment which resulted in a worker's compensation settlement [Doc. No. 14-2 at 2-3]. The December 1998 worker's compensation settlement (Tr. 122-27), which pre-dates the alleged onset date of Plaintiff's disability by more than three years, found that as a result of a construction accident, Plaintiff "will retain a percent permanent partial impairment of Eight (8%) to the left hand, Thirteen (13%) to the left wrist, which equates to a Twenty (20%) permanent partial impairment to the left upper extremity . . ." (Tr. 122). In his decision, the ALJ found Plaintiff "has limitations, primarily as a result of a seizure disorder, hypertension, and history of left wrist sprain/tenosynovitis, which restrict him to light work." (Tr. 23). Thus, with regard to Plaintiff's hypertension and left arm/wrist injury, the ALJ clearly took these limitations into consideration. With regard to these conditions, the Plaintiff can point to no evidence in the record which would impose limitations greater than those found by the ALJ with the exception of Dr. Mastey's March 8, 2004 treatment note concerning Plaintiff's left upper extremity (Tr. 719). The ALJ correctly noted, however, that Dr. Mastey's treatment note was unsupported by any underlying treatment records and declined to accord it any weight (Tr. 22).

The only evidence relating to any back injury dates to the period from 1999 to 2000 (Tr. 314, 383, 420). On January 30, 1999, after Plaintiff fell, Dr. Killen interpreted an x-ray as showing mild hypertrophic changes in the spine (Tr. 383). On December 8, 1999, after Plaintiff was assaulted, Dr. Kyle interpreted an x-ray as showing a tiny occult fracture of the superior endplate of T12 and suggested a bone scan (Tr. 420-21), The bone scan, performed on January 6, 2000, showed an

abnormality in the T10 vertebral body (Tr. 314). Again, this evidence dates from more than two

years prior to the time of Plaintiff's alleged onset of disability, when Plaintiff was laid off from work,

and Plaintiff can point to no evidence of record subsequent to his alleged onset of disability in June

2002, which suggests any limitation stemming from his alleged back injury.

With regard to his obesity, Plaintiff contends he would have satisfied Listing 9.09 (1999)

based upon his hypertension and obesity, but admits this listing was deleted on October 25, 1999,

well before Plaintiff filed his applications for disability or the alleged onset of his disability in June

2002. When Listing 9.09 was deleted, however, Listing 1.00Q was added to the listing of

impairments. Listing 1.00Q states:

> Effects of obesity. Obesity is a medically determinable impairment
> that is often associated with disturbance of the musculoskeletal
> system, and disturbance of this system can be a major cause of
> disability in individuals with obesity. The combined effects of obesity
> with musculoskeletal impairments can be greater than the effects of
> each of the impairments considered separately. Therefore, when
> determining whether an individual with obesity has a listing-level
> impairment or combination of impairments, and when assessing a
> claim at other steps of the sequential evaluation process, including
> when assessing an individual's residual functional capacity,
> adjudicators must consider any additional and cumulative effects of
> obesity.

20 C.F.R Pt. 404, Subpt. P, Appx. 1, Listing 1.00Q.

During his April 22, 2003 consultative evaluation, Dr. Holland indicated Plaintiff was 66½

inches in height and weighed 258 pounds (Tr. 537-38) and he described Plaintiff as obese (*id.*). Dr.

Holland, who was clearly aware Plaintiff was obese, stated he was unable to find any actual physical

limitations as the result of his examination of Plaintiff (Tr. 539).

The ALJ's decision does not mention obesity and the ALJ did not find that obesity constituted

a severe impairment. In this instance, however, the only musculoskeletal impairment found by the

ALJ was Plaintiff's "history of treatment for a left wrist sprain/tenosynovitis." (Tr. 22). Plaintiff has not pointed to any evidence in the record nor has he even suggested how his obesity could worsen his left wrist sprain/tenosynovitis. As the result of his examination of the Plaintiff, whom he described as obese, Dr. Holland found Plaintiff had "[n]ormal range of motion at the shoulders, elbows, wrists and hand with 5/5 grip strength bilaterally." (Tr. 538).

"A failure to explicitly consider the effects of obesity may be harmless error." *Nelson v. Barnhart*, No. 06-C-249 C, 2006 WL 3042954, * 6 (W.D. Wis. Oct. 24, 2006) (citing *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006)). In *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004), the claimant who alleged he was unable to work due to osteoarthritis in his knees, sought a remand because the ALJ failed to mention the claimant's obesity in his decision. The Seventh Circuit found that a remand was unwarranted and the failure to mention obesity was harmless error because: (1) the claimant did not specify how his obesity further impaired his ability to work and (2) the ALJ adopted the limitations set forth by the physicians who were aware of claimant's obesity and, thus, it was indirectly factored into the ALJ's decision. *Id.* Similarly, in *Nelson*, the court declined a remand to consider whether the claimant's obesity combined with her scoliosis was severe enough to meet or equal a listed impairment because Plaintiff failed to indicate what listing she thought was satisfied and the consultants who reviewed the record were aware of her obesity. *Nelson*, 2006 WL 3042954 at * 6. Similarly, Dr. Holland, who was aware of Plaintiff's obesity, found no physical limitations based upon his examination of the Plaintiff. Further, although Plaintiff complains the ALJ did not consider his obesity, he does not explain how his obesity would have further limited his ability to engage in work beyond the limitations found by the ALJ and, except for a listing which was deleted prior to the time he even alleges his disability began, he has not identified any other listing

relating to physical impairments which he alleges could be satisfied by his obesity in conjunction with his other impairments.

Although Plaintiff did mention obesity in his pre-hearing memorandum by stating he had a medical history of obesity (Tr. 186), he never listed obesity as a cause of disability on his application for disability (Tr. 119-21). On appeal, Plaintiff's argument focuses primarily on his mental condition and, although Plaintiff asserts he has a back impairment, no evidence supports a finding of any limitation to his RFC as a result of the alleged back impairment. While it would have been better had the ALJ at least discussed obesity in his decision, because there is an absence of evidence in the record of any musculoskeletal impairment which could be worsened by obesity, the ALJ's failure to discuss Plaintiff's obesity was harmless error.

At step five, after finding Plaintiff could not return to his past relevant work, the ALJ incorporated his findings regarding the physical and mental limitations imposed on Plaintiff's RFC into a hypothetical to the VE. The VE identified jobs existing in significant numbers the Plaintiff could perform given his RFC. The VE's testimony constitutes substantial evidence to support the ALJ's finding that, despite his physical and mental limitations, the Plaintiff retains the RFC to perform a significant number of jobs existing in the regional and national economy. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002); *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987); *Bradford v. Sec'y of Dep't of Health and Human Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) (per curiam). The ALJ's hypothetical accurately portrayed the Plaintiff's physical and mental limitations as supported by the record, particularly the ME's testimony concerning Plaintiff's mental limitations. Thus, the VE's testimony constitutes substantial evidence to support the ALJ's decision.

Accordingly, the decision of the ALJ denying benefits to the Plaintiff is supported by substantial evidence in the record and it will be **AFFIRMED**.

### Conclusion

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, for the reasons stated above:

(1)     Plaintiff's motion for judgment on the pleadings [Doc. No. 14] is **DENIED**;

(2)     Defendant's motion for summary judgment [Doc. No. 17] is **GRANTED**;

(3)     A separate Judgment is hereby entered pursuant to Rule 58 of the Federal Rules of Civil Procedure **AFFIRMING** the Commissioner's decision which denied benefits to the Plaintiff; and

(4)     This action is **DISMISSED**.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE